OPINION
{¶ 1} In an automobile accident case tried in the Butler County Court of Common Pleas, a jury awarded $5,000 to plaintiff-appellant and cross-appellee, Julie Stephens, and nothing to her husband, plaintiff-appellant and cross-appellee, Scott Stephens. The Stephenses appeal, arguing that the trial court erred by not granting a directed verdict in their favor or, alternatively, a new trial and/or a judgment notwithstanding the verdict. We affirm the decision of the trial court.
 {¶ 2} Defendants-appellees and cross-appellants are Vick Express, Inc. and Nabil Mohammed Shanin. On September 21, 1998, while driving to work, Julie was rear ended in a chain reaction automobile accident on I-75. As a result of her airbag deploying, Julie suffered a laceration in her left eyebrow, where the supraorbital nerve is located, and minor bruises to her arms. She was taken to a hospital where she received four layers of stitches, the top layer having 15 stitches. She was released the same day. She did not return to work for a full week. Julie also missed work one day in October when she felt lightheaded and had to leave the office.
 {¶ 3} Following the accident, Julie suffered from headaches and had trouble concentrating at work and putting sentences together. By early October, those symptoms had subsided. They were replaced, however, by drilling pains lasting up to 30 minutes, electrical prickly sensation, tingling, and numbness in the area of the laceration. As a result of those pains, Julie saw her family doctor, Pamela Hanson, M.D., several times between September 1998 and January 1999. A CAT scan ordered by Dr. Hanson was normal. Dr. Hanson eventually diagnosed Julie with a closed head injury and post-concussion syndrome. By the end of 1998, the tingling, prickly, and numbness sensations were no longer occurring daily but intermittently and could be relieved by rubbing the area. Nevertheless, Dr. Hanson referred Julie to John Feibel, M.D., a neurologist.
 {¶ 4} Julie saw Dr. Feibel in February 1999. During that first visit, Dr. Feibel diagnosed Julie with a decreased sensory perception in the area of the supraorbital nerve. Dr. Feibel stated that Julie's complaints of tingling, numbness, and pins and needles indicated that the nerve was injured, and not merely bruised. However, since there was "clearly no complete lesion of that nerve," Dr. Feibel stated that Julie might fully recover. Dr. Feibel did not diagnose Julie with a closed head injury or post-concussion syndrome.
 {¶ 5} By March 1999, the drilling pains had stopped. Although the scar was healing very well, Julie was nevertheless concerned about it. Her attorney referred her to Bradley Linberg, M.D., an ear, nose, and throat specialist, who saw Julie in September 1999, a year after the accident. Although seeing her primarily for her scar, Dr. Linberg also diagnosed Julie with decreased sensation of the left supraorbital nerve. He did not diagnose her with post-concussion syndrome. Dr. Linberg testified that since Julie still had some sensation in the area of the nerve, the nerve had not been totally severed. Dr. Linberg opined that Julie's nerve injury was permanent and that no surgery or medication would correct the numbness.
 {¶ 6} Knowing that he was going to give his deposition, Julie went back to see Dr. Feibel in December 2001. Dr. Feibel diagnosed her with permanent injury to the left supraorbital nerve. At trial, Julie testified that her scar had fused well and appeared to be perfect. Julie also testified that she only notices the tingling and numbness sensations two to three times per week and that they are not as bad as they used to be. Julie suffered no loss of vision.
 {¶ 7} In May 2000, the Stephenses filed a complaint against appellees alleging negligence and seeking damages for Julie's medical expenses, lost wages, pain and suffering, loss of enjoyment of life, and for Scott's loss of consortium incurred as a result of the accident. Prior to trial, appellees admitted liability. As a result, the matter went to trial on the issue of damages only. At trial, the Stephenses testified as well as Dr. Hanson. The videotapes of the depositions of Drs. Feibel and Linberg were played to the jury. Appellees did not present any witnesses.
 {¶ 8} Following the admission of their exhibits, the Stephenses rested and moved for a directed verdict which was denied by the trial court. Thereafter, following the admission of their exhibits, appellees rested. The Stephenses unsuccessfully renewed their motion for a directed verdict. On February 6, 2002, a jury awarded $5,000 to Julie for her damages and nothing to Scott. The jury verdicts were not tested by interrogatories. On February 27, 2002, the Stephenses moved for a new trial and/or a judgment notwithstanding the verdict. Their motion was denied by the trial court on March 4, 2002. This appeal follows.
Assignment of Error No. 1
 {¶ 9} "Did the trial court err to the prejudice of the appellants/cross-appellees by denying appellants/cross-appellee's [sic] motion for directed verdict on the issue of permanency and causation?"
 {¶ 10} Pursuant to Civ.R. 50(A)(4), a motion for directed verdict may be granted on a determinative issue if, construing the evidence most strongly in favor of the party opposing the motion, reasonable minds could only decide the issue in favor of the moving party. The party opposing the motion is entitled to the benefit of all reasonable inferences in the evidence. Broz v. Winland, 68 Ohio St.3d 521, at 526,1994-Ohio-529. A motion for directed verdict is a question of law. As a result, we review the trial court's decision de novo. Campbell v. Colley
(1996), 113 Ohio App.3d 14, 18.
 {¶ 11} The Stephenses rested after their exhibits were admitted. They then moved for a directed verdict on two issues, the causation between the accident and the medical bills incurred by Julie, and the permanency of Julie's injuries. The motion was denied on both issues. Thereafter, appellees rested following the admission of their exhibits. Once again, the Stephenses moved for a directed verdict on the issue of permanency of the injuries. Once again, their motion was denied.
 {¶ 12} We find that the Stephenses' motion for directed verdict on the medical bills was properly denied as it was premature. A motion for a directed verdict must be properly made before it can be considered by the trial court. Eckhart v. Walters (Apr. 6, 1983), Clermont App. No. 1155, at 3-4. Civ.R. 50(A)(1) provides that a motion for a directed verdict may be made on the opening statement of the opponent, at the close of the opponent's evidence, or at the close of all the evidence. Such motion made at any other stage of the proceedings is not a "properly made" motion as required by Civ.R. 50(A)(4), and therefore may neither be entertained nor granted by the trial court. Sherwin v. Cabana Club Apartments (1980),70 Ohio App.2d 11, 15.
 {¶ 13} In the case at bar, the Stephenses moved for a directed verdict on the medical bills before appellees opened or closed their case. The trial court may well have thought that since appellees had no witnesses to call, they had no case to present. Nevertheless, the motion was premature and should not have been entertained by the trial court. See Biddle v. Mayfield (Mar. 25, 1986), Franklin App. No. 85AP-751. In addition, by failing to renew that motion at the conclusion of all of the evidence, the Stephenses have waived the issue which is not properly before this court. Eckhart, Clermont App. No. 1155, at 4.
 {¶ 14} Unlike the motion for the medical bills, the Stephenses' motion for directed verdict on the issue of permanency of the injuries was renewed at the close of all evidence and was therefore properly made. For the following reasons, we find that it was properly denied by the trial court.
 {¶ 15} By March 1999, all the symptoms experienced by Julie following the accident had disappeared except for the tingling and numbness sensations. Julie testified that she only notices the sensations two to three times a week and that they can be relieved by rubbing the area. Julie testified that she still has some sensation in the left eye area and that the amount of partial loss has never been quantified. Julie's attorney referred her to Dr. Linberg who had done several evaluations for her attorney in the past three years.
 {¶ 16} Dr. Linberg testified that his evaluation of Julie lasted no longer than 30 minutes and that his entire involvement with the case up to his deposition was one hour. Although she was seeing him primarily for her scar, Dr. Linberg nevertheless diagnosed her with decreased sensation of the left supraorbital nerve. The diagnosis was based upon a cotton ball test, wherein the physician touches portions of a patient's scalp with a cotton ball to determine any lack or reduction of sensation. Dr. Linberg stated that there was no objective test to measure the amount of sensation, and that any diagnosis "very much depends upon the patient's description." Dr. Linberg testified that Julie's supraorbital nerve had not been totally severed. Dr. Linberg testified that while Julie could recover fully, he nevertheless opined that she would have tingling and numbness for the rest of her life. Dr. Linberg stated that no surgery or medication could correct the numbness.
 {¶ 17} Julie was first referred to Dr. Feibel by Dr. Hanson. During their first visit, following a cotton ball test, Dr. Feibel diagnosed Julie with a decreased sensory perception in the area of the left supraorbital nerve. In a written report, Dr. Feibel noted that Julie might recover fully or be left with some deficit. Julie did not see Dr. Feibel again for almost two years. However, knowing that he was going to give a deposition, Julie went back to see him in December 2001. Dr. Feibel gave his deposition, for which he was paid $750 an hour, on January 30, 2002, a week before the jury trial. During that second visit, Dr. Feibel apparently conducted the cotton ball test. Dr. Feibel agreed that the results of the test depended on what the patient said. This time, Dr. Feibel diagnosed Julie with permanent injury to the left supraorbital nerve. Dr. Feibel testified that there were some medications that could be helpful, but that Julie evidently did not want or need or feel she needed medication at that time.
 {¶ 18} Construing the foregoing evidence most strongly in favor of appellees as we must, we cannot say that the evidence leads to only one reasonable conclusion, that is, that Julie is permanently injured. The trial court was entitled to disregard any part of the expert diagnosis. The trial court was also entitled to consider the fact that Drs. Linberg and Feibel were paid experts hired by the Stephenses. See Reece v. Ruiz
(Dec. 20, 1999), Butler App. No. CA99-02-021. In light of the foregoing, we therefore find that the trial court properly denied the Stephenses' motion for a directed verdict on the issue of permanency of Julie's injuries. The Stephenses' first assignment of error is accordingly overruled.
Assignment of Error No. 2
 {¶ 19} "Did the trial court err to the prejudice of the appellants/cross-appellees by denying appellants/cross-appellee's [sic] motion for a new trial or motion notwithstanding the verdict based upon Ohio Civil Rules 59(2), (4) and (6)?"
 {¶ 20} We note at the outset that although the Stephenses' second assignment of error refers to their motion for a new trial or motion for judgment notwithstanding the verdict, they only argue that the trial court erred by not granting them a new trial. Our analysis will therefore be limited to the trial court's denial of their motion for a new trial.
 {¶ 21} The Stephenses sought damages for Julie's medical expenses ($2,776.78), lost wages ($784.31), pain and suffering, loss of enjoyment of life, and for Scott's loss of consortium. Julie's medical expenses and lost wages amount to $3,561.09. The jury awarded $5,000 to Julie and nothing to Scott. The Stephenses first argue that the jury's award was against the manifest weight of the evidence because it gave nothing for Scott's loss of consortium and only gave $1,438.91 for Julie's pain and suffering despite "the permanent injury that she has and will continue to have for the rest of her life."
 {¶ 22} Civ.R. 59(A)(6) provides that a new trial may be granted when "the judgment is not sustained by the weight of the evidence." Because a trial court has broad discretion in determining whether a jury verdict is against the manifest weight of the evidence, Osler v. Lorain
(1986), 28 Ohio St.3d 345, 351, a trial court's ruling on a motion for a new trial based upon the weight of the evidence will not be reversed absent an abuse of discretion. Antal v. Olde Worlde Prod., Inc. (1984),9 Ohio St.3d 144, 145. Moreover, when a jury's award is supported by some competent, credible evidence going to the essential elements of the case, that award will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279, 280. In the area of damages in a personal injury case, neither a reviewing court nor a trial court can substitute its judgment for that of the jury. Litchfield v. Morris
(1985), 25 Ohio App.3d 42, 44.
 {¶ 23} As a result of the accident, Julie suffered a laceration in her left eyebrow which required several layers of stitches, and minor bruises to her arms. Julie testified that following the accident, she had trouble concentrating at work and putting sentences together, and suffered from headaches, drilling pains, electrical prickly sensations, tingling, and numbness in the area of the laceration. Eventually, those symptoms subsided with the exception of the tingling and numbness. Julie testified that she only notices them two to three times a week and that they can be relieved by rubbing the area. Dr. Linberg testified that Julie's injury in the area of the supraorbital nerve was permanent and that no surgery or medication would correct the numbness. Dr. Feibel testified too that Julie's injury was permanent but that there were some medications that could be helpful.
 {¶ 24} Julie has a lazy eye, her right eye. Julie testified that as a result of the laceration to her left eyebrow, she was very concerned that she may lose vision in her left eye, her dominant eye. Fortunately, Julie suffered no vision loss. Julie also testified that she was initially afraid of being disfigured and that she was self-conscious about her scar for over a year after the accident. Julie testified that her scar fused well and that it appears to be perfect. Julie explained how being very tired for a week after the accident, she could not take care of the house and cook. As a result, she and Scott ate a lot of fast food and take out. Julie testified that due to fatigue and headaches, they missed church the first week after the accident, had to leave a relative's wedding reception in November 1998 early, and had to delay trying to conceive for a few months. Julie also testified that for the first time in 26 years, she missed Oktoberfest in her hometown. Finally, Julie testified that driving or riding in a car remains difficult as she is very anxious and apprehensive.
 {¶ 25} Scott confirmed Julie's testimony regarding missing church and Oktoberfest, leaving the wedding reception early, and Julie's anxious and apprehensive behavior when in a car, especially as a passenger. Scott testified that following the accident, Julie was tearful, could not be hugged because of her bruises, and was so restless at night that they had to sleep apart for three to five days. Julie started feeling better two weeks after the accident. Scott also testified that because he is not a good cook, they ended up eating fast food and take out, and that he had to do chores around the house he had not done very often. However, things went back to normal two to four weeks after the accident. Scott testified that although the scar has healed up nicely over time, he can still see it. Scott also admitted finding his normally beautiful wife not attractive at all after the accident. Finally, Scott explained how the accident affected their intimacy for a few months. At the time of the accident, the Stephenses were trying to conceive, and more specifically, were trying to find out if he was infertile. Scott testified that as a result of the headaches and stress brought on by the accident, they could not make love for three months. At the time of the trial, they were the parents of an adopted ten-month-old daughter.
 {¶ 26} Following closing arguments, the trial court instructed the jury that the Stephenses were seeking damages for the physical injuries, medical expenses, past and future pain and suffering, and loss of consortium, and that the jury could not overlap or duplicate the amount of its award. Thus, "any amount of damages awarded * * * Julie Stephens for pain and suffering must not be awarded again as an element of damages for [Scott] Stephens['] consortium claim[,]" and vice versa.
 {¶ 27} As the trier of fact in this case, the jury was "free to accept or reject any or all of [appellants'] evidence relating to * * * damages." Krauss v. Kilgore (July 27, 1998), Butler App. No. CA97-05-099, at 13. Moreover, even assuming that the Stephenses presented undisputed evidence, the jury possessed the inherent power to reject the evidence presented. Id. A jury is free to reject any evidence and is not required to accept evidence simply because it is uncontroverted, unimpeached, or unchallenged. Ace Steel Baling, Inc. v. Portefield
(1969), 19 Ohio St.2d 137, 138.
 {¶ 28} In addition, the jury's award was not tested by interrogatories. While the Stephenses could have requested such interrogatories pursuant to Civ.R. 49(B), they did not do so. Such an omission fails to inform a reviewing court in the context of a motion for a new trial of that evidence which the jury ultimately accepted or rejected in reaching its verdict.
 {¶ 29} Having reviewed the record, and in light of the foregoing, we decline, as did the trial court, to substitute our judgment for that of the jury. Finding some competent, credible evidence to support the jury's verdict, we find that the trial court did not err by failing to grant a new trial pursuant to Civ.R. 59(A)(6).
 {¶ 30} The Stephenses also argue that several remarks made by appellees' counsel in closing argument improperly attacked the credibility of the Stephenses and their expert witnesses, Drs. Linberg and Feibel, thereby improperly prejudicing the jury and resulting in the inadequate damage award.
 {¶ 31} Civ.R. 59(A)(2) provides that a new trial may be granted upon a showing of misconduct by the prevailing party. A new trial may also be granted because of "[e]xcessive or inadequate damages, appearing to have been given under the influence of passion or prejudice." Civ.R. 59(A)(4). The determination of whether alleged misconduct of counsel was sufficient to taint the verdict with passion or prejudice ordinarily lies within the sound discretion of the trial court. Lance v. Leohr (1983),9 Ohio App.3d 297, 298. "Before a reviewing court will disturb the exercise of the trial court's discretion, the record must clearly demonstrate highly improper argument by counsel which tends to inflame the jury." Id. at 298.
 {¶ 32} It is well-settled that counsel is afforded wide latitude in closing arguments. Cusumano v. Pepsi Cola Bottling Co. (1967),9 Ohio App.2d 105, 122. However, remarks that are not supported or warranted by the evidence and which are calculated to arouse passion or prejudice or are designed to misrepresent the evidence to the extent that there is a substantial likelihood that the jury might be misled may constitute prejudicial error. See Jones v. Macedonia-Northfield BankingCo. (1937), 132 Ohio St. 341.
 {¶ 33} An expert's bias and pecuniary interest are fair subjects for argument. Clark v. Doe (1997), 119 Ohio App.3d 296, 306. However, the permissible bounds of fair argument are not unlimited and when they are crossed, the violation must be appropriately addressed. Id. The determination of whether the bounds of permissible argument have been exceeded is a discretionary function to be performed by the trial court. Id. The trial court's determination will not be reversed absent an abuse of discretion. Pang v. Minch (1990), 53 Ohio St.3d 186, 194.
 {¶ 34} During closing argument, appellees' counsel attacked the credibility of Dr. Linberg as follows: "First, Mr. Acciani, who is [the partner of the Stephenses' attorney], decides that — he's send her to Dr. Bias. I call him Dr. Bias because of a letter that Mr. Acciani sent him. And he said — * * * Would you take a look at her and if we did a judgment of proceeds that goes over the medical bills, we'll pay them. Isn't that great? You get free services if you win." The letter referred to during closing argument was read during Dr. Linberg's deposition and stated:
 {¶ 35} "Please be advised that we represent Julie Stephens in a claim for injuries caused by an accident. There is a debt owed to you for medical services, and that debt is included as part of her claim for damages resulting from that accident. With our client's permission, the amount due for treatment resulting from this action will be protected to the extent that sufficient funds are realized by Ms. Stephens. We will withhold this amount due to you from any net funds that Ms. Stephens receives by way of settlement or judgment as long as you withhold collection efforts until the case is resolved. Thank you in advance for your cooperation."
 {¶ 36} There was no objection by counsel for the Stephenses to the "Dr. Bias" comment. It is well-established that when a party fails to bring to the attention of the trial court an error at a time when the error could have been corrected, the party is deemed to have waived the right to challenge the error on appeal. See Koczan v. Graham (Sept. 27, 2000), Lorain App. No. 98CA007248.
 {¶ 37} Appellees' counsel also attacked the credibility of Dr. Feibel and the Stephenses during closing argument. With regard to Dr. Feibel, appellees' counsel noted how the doctor "gets paid $750 an hour. * * * I don't know any doctor that gets paid that. * * * I was curious last night and I like numbers, if you took that out for fifty two weeks, forty hours a week at seventy-fifty — he's making a million five. Good business if you can get it." An objection to the statement was subsequently overruled by the trial court. The record shows that Dr. Feibel did state he charges $750 an hour to testify. However, he was never asked how many times a year or how many hours per year he testifies. There was also no evidence that his practice consisted solely of testifying as an expert witness. The statement by appellees' counsel was therefore not supported by the record and was improper.
 {¶ 38} Appellees' counsel also attacked the Stephenses' credibility as follows: "But what we're asking you to do today here is to give * * * her a fair measure of her actual damages. To have her — take responsibility for her own conduct, but we'll be responsible for what we did. * * * As I got a little more involved in the case, my sympathy turned to skepticism, which eventually turned to disgust.
 {¶ 39} "Now, this — is the type of case that — you try to give the benefit of the doubt to Miss Stephens, and I gave up in despair. This case really isn't about an automobile accident, it's certainly not in the $69,000 in claims damages [as was argued by the Stephenses' attorney during his closing argument]. It has to be about something else. * * * Like an underlying frustration. Some self[-]esteem problems. Some problems in their marital life. Some problems with their reproductive issues. They can't handle it. And they want somebody to pay. Regardless. Whether or not they caused those problems. You know what, if it wasn't gonna be my client, my clients, it was gonna be somebody else. For example, the next person I think in line was gonna be [the ER doctor] —." Counsel for the Stephenses objected and the trial court sustained the objection.
 {¶ 40} Appellees' counsel then commented "[t]hey will be paid for the car damage. Maybe they thought it was an easy buck, but now they were gonna go after the big bucks." An objection to that statement was overruled by the trial court. Appellees' counsel proceeded by noting how the Stephenses had "found an attorney to aid them in doing so." There was no objection to that comment. Thereafter, appellees' counsel went to argue how the case was about a perfect scar, headaches requiring no medication or time off, and tingling which had never been proven by an objective test.
 {¶ 41} Statements by appellees' counsel about Dr. Feibel making more than a million dollars a year and about the Stephenses suing appellees and potentially anybody else because of their reproductive problems were not supported by the record and were improper. However, while improper, these comments do not constitute reversible errors. With regard to Dr. Feibel, appellees' counsel's statement was intended as an attack upon the credibility of the doctor by arguing his potential bias and pecuniary interest, especially in light of the fact that Dr. Feibel, when deposed a little over a month after his second visit with Julie, could not remember what he had done during that second visit to diagnose Julie with permanent injury to her left supraorbital nerve.
 {¶ 42} With regard to appellees' counsel's foregoing comments about the Stephenses, we note that the objection to the first comment was sustained by the trial court. In its jury instructions, the trial court specifically instructed the jurors that the evidence presented did not include the attorneys' statements and arguments, and that statements stricken by the trial court were not to be considered in their deliberations. Juries are presumed to follow and obey the instructions given to them by the trial court. While the objection to the second comment was overruled, we cannot say that the comment amounted to reversible error.
 {¶ 43} Nor does the record show that appellees' counsel's comments were so highly improper or inflammatory that the jury's verdict was the product of prejudice. The jury did award Julie damages above her medical expenses and lost wages. While the award fell quite short of the $69,000 figure suggested by her attorney during closing argument, the mere size of a verdict is insufficient to prove prejudice. See Wilhoite v. Kast, Warren App. No. CA2001-01-001, 2001-Ohio-8621.
 {¶ 44} Upon thoroughly reviewing the evidence presented at trial, and appellees' counsel's closing argument, we cannot say that the trial court's failure to grant a new trial based upon appellees' counsel's remarks and/or the size of the verdict rises to the level of an abuse of discretion. We therefore find that the trial court did not err by failing to grant a new trial pursuant to Civ.R. 59(A)(2) or (4). The Stephenses' second assignment of error is overruled.
 {¶ 45} As the caption of the case indicates, appellees originally filed a cross-appeal. However, by notice filed on February 3, 2003, appellees moved to voluntarily dismiss their cross-appeal against the Stephenses. As appellees noted in their notice, they "did not file a brief in support of their cross-appeal, nor did they make any arguments in support of same" during oral arguments before this court. Appellees' cross-appeal is hereby dismissed with prejudice at appellees' costs.
Judgment affirmed.
YOUNG, J., concurs.
VALEN, P.J., concurs in part and dissents in part.